# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————

Nº 14-CV-3579 (JFB)(ARL)

—————————————

## GENERAL STAR INDEMNITY COMPANY

Plaintiff,

VERSUS

## DRIVEN SPORTS, INC.,

Defendant.

—————————————

**MEMORANDUM AND ORDER**
January 23, 2015

—————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff is an insurer who issued a liability and litigation insurance policy ("the Policy") to defendant, a producer and seller of a pre-workout energy supplement called "Craze." In 2013, defendant was sued in three separate actions ("the Craze Actions") alleging that Craze contains an illegal and potentially dangerous methamphetamine analog, and defendant sought coverage under the Policy. Both parties have moved for summary judgment, asking the Court to declare the extent of plaintiff's obligation to defend the underlying lawsuits.

The Court concludes that the underlying lawsuits are excluded from coverage by a provision in the Policy ("the Failure to Conform Exclusion") which states that the Policy does not apply to "'[p]ersonal and advertising injury' arising out of the failure of goods, products or services to conform with any statement of quality or performance made in [defendant's]

'advertisement.'" According to the complaints in the underlying lawsuits, defendant's advertisements allegedly (1) made a statement of quality about Craze, namely, that it contained only natural ingredients, and (2) Craze failed to conform with those statements, because it actually contained an illegal and potentially dangerous methamphetamine analog. It is abundantly clear that all the injuries alleged in these underlying lawsuits "aris[e] out of" Craze's failure to conform with Driven Sports' statements, and thus, the Failure to Conform Exclusion bars coverage.

Plaintiff also seeks to recoup its expenses in defending the underlying lawsuits, but the Court declines to award recoupment as a remedy, finding that the New York Court of Appeals would find recoupment to be inappropriate under these circumstances. Plaintiff's theory for recoupment is that defendant has been unjustly enriched because plaintiff has incurred the costs in representing defendant

in the underlying litigation, even though the Court has now concluded that the underlying claims are excluded from coverage. However, unjust enrichment claims are generally precluded under New York law where the contract addresses the particular subject matter at issue. Here, the Policy provides that plaintiff will pay "all expenses" with respect to the underlying lawsuits, and plaintiff did not include a recoupment provision in the Policy. In addition, plaintiff sought to reach a recoupment agreement with defendant, but defendant refused. The Court will not, in essence, create that recoupment agreement and re-write the Policy by relying on a quasi-contract theory, when plaintiff could have addressed recoupment in the Policy, but chose not to. Recent decisions in other jurisdictions have reached the same result, and the Court concludes that those case are persuasive, and that the New York Court of Appeals would reach the same conclusion under New York law.

However, the Court agrees with plaintiff that its expenses in defending the underlying lawsuits do reduce the Policy's limits of coverage.

## I. BACKGROUND

### A. Factual Background

The Court takes the following facts from the parties' Rule 56.1 Statements of Fact, declarations, and the exhibits attached thereto, construing the facts in the light most favorable to the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Where, as here, both parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party

whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (internal quotation marks and citation omitted).

Although the parties' Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. Unless otherwise noted, where a Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record. The Court also cites the complaints in the underlying actions, which have been attached as exhibits and the contents of which are not disputed by either party.[1]

### 1. Policy Language

Plaintiff issued a "Commercial Lines Policy" ("the Policy") providing litigation and liability insurance to defendant covering the period from November 1, 2012 to November 1, 2013. (Pl. 56.1 ¶ 1.) The Policy has a $3 million aggregate limit of liability, and a $2 million limit for a personal and advertising injury for any one person. (*Id.* ¶ 2.) The Policy explains plaintiff's duty to both defend and indemnify defendant as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of

---

[1] Both parties requested that the Court take judicial notice of certain materials: plaintiff submitted filings from related New York cases in order to show the content of the contract provisions at issue, and defendant submitted certain dictionary definitions. The Court has taken judicial notice of these materials, without objection from either party. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute.").

'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or 'suit' that may result. But . . . [t]he amount we will pay for damages and Supplementary Payments is limited as described [elsewhere] . . . and . . . [o]ur right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements, <u>or</u> Supplementary Payments.

(*Id.* ¶ 3.)

The "Supplementary Payments" referred to above are defined as including specific types of investigative expenses, such as an insured's time off from work, and also costs such as bail bonds and interest. (*Id.* ¶ 6.) The Policy also defines "Supplementary Payments" more generally, however:

We will pay, with respect to any claim we investigate or settle or any 'suit' against an insured we defend: . . . [a]ll expenses we incur.

(*Id.*)

The Policy contemplates these expenses in defense of a "personal and advertising injury," which it defines as follows:

"Personal and advertising injury" means injury, including consequential 'bodily injury,' arising out of [*inter alia*] . . . [o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

(*Id.* ¶ 4.) However, certain personal and advertising injuries are expressly excluded from coverage by the Failure to Conform Exclusion. In particular:

This insurance will not apply to . . .
**Quality or Performance of Goods—Failure to Conform to Statements**
"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement."

(*Id.* ¶ 5.)

2. Underlying Craze Actions

On August 22, 2013, Nutrition Distribution LLC ("Nutrition") filed a complaint against defendant in the United States District Court for the Central District of California (*id.* ¶ 8), describing the suit as "a civil action arising from Defendants' false advertising and blatant misrepresentations regarding its Craze pre-workout nutritional supplement which is marketed as containing a natural extract as its active ingredient, when, in fact, it contains illegal analogs to methamphetamine." (Ex. 2 to Duffield Decl. ¶ 1.)

3

In October and November of 2013,[2] Shantell Olvera and Marcus Wagner filed putative class actions against defendant in the United States District Court for the Northern District of California, which were ultimately consolidated into one action. (Pl. 56.1 ¶¶ 9-13.) The consolidated complaint alleges that defendant markets Craze as containing "only natural ingredients" (Ex. 7 to Duffield Decl. ¶ 42), when in fact it contains ETH, a synthetic and potentially dangerous methamphetamine analog. (*Id.* ¶¶ 51, 81.)

On December 10, 2013, Andrew Stewart filed a putative class action complaint against defendant in the United States District Court for the Northern District of Illinois, alleging that defendant "fail[ed] to disclose the presence of an illegal methamphetamine analog in its 'Craze' . . . pre-workout supplement in any of its representations regarding the Product." (Ex. 8 to Duffield Decl ¶ 1.) The complaint further describes the "illegal methamphetamine analog" as "similar to the highly addictive psychoactive drug methamphetamine" (*id.* ¶ 10), with an alleged potency "somewhere between methamphetamine and ephedrine, both of which are banned substances." (*Id.* ¶ 16.)

### 3. Coverage for the Underlying Actions

Plaintiff agreed to provide a litigation defense in all three underlying actions, subject to a complete reservation of its rights, including the right to recoup any amounts paid in the defense of the actions, if it were determined that the Policy did not require coverage. (Pl. 56.1 ¶¶ 15-17.)

However, the text of the Policy does not address whether plaintiff could seek recoupment. Instead, as noted above, it simply says that plaintiff "will pay, with respect to any claim we investigate or settle or any 'suit' against an insured we defend: . . . [a]ll expenses we incur." (*Id.* ¶ 6.)

When originally negotiating the provision of coverage, plaintiff had proposed that defendant sign a "non-waiver and defense funding agreement," which "provided that defense expenses would erode the Policy's limit of liability and that Driven Sports would agree to repay any defense expenses in the event that it is finally determined that such amounts are not covered under the Policy." (Ex. 114 to Lowe Decl. at 1.) Defendant rejected plaintiff's offer, and thus plaintiff's reservation of the right to seek recoupment remained unilateral. (*Id.* at 1-4.)

### B. Procedural History

Plaintiff filed the complaint in this action, seeking a declaratory judgment, on June 6, 2014. Defendant answered and counter-claimed on July 18, 2014. The parties cross-filed motions for summary judgment on July 28, 2014, and opposed each other's motions on August 11, 2014. The parties replied in further support of their motions on August 22, 2014. On August 29, 2014, defendant sought leave to file a sur-reply in order to respond to certain cases cited in plaintiff's reply. Plaintiff opposed that request, but the Court granted it on September 4, 2014, while informing plaintiff that it could address any matter raised in the sur-reply at the oral argument, which was

---

[2] There is no dispute concerning whether any of the underlying actions are within the Policy's period of coverage.

held on September 29, 2014.[3] Following the oral argument, defendant submitted a number of "supplemental requests for judicial notice." Plaintiff objected to these supplemental submissions on procedural grounds, and also opposed them on the merits.

The matter is fully submitted before the Court, and the Court has fully considered the submissions and arguments of the parties (including the post-argument submissions).[4]

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for

---

[3] Although plaintiff opposed defendant's request to file a sur-reply, it is clear that plaintiff was not prejudiced by defendant's filing of the sur-reply. The Court has considered all of the filings related to both cross-motions, and at oral argument, plaintiff did not specifically address any aspect of defendant's sur-reply.

[4] The Court need not consider the plaintiff's procedural objections to defendant's post-argument submissions because, even after fully considering the merits of the materials and arguments contained therein, the Court concludes that defendant is still entitled to summary judgment on the application of the Failure to Conform Exclusion, and nothing in those supplemental submissions affect the Court's determinations on the merits of the issues contained in the cross-motions.

summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

Where, as here, both parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co.*, 628 F.3d at 51 (internal quotation marks and citation omitted).

Finally, the Court notes that both parties seek a declaratory judgment. "The decision to grant declaratory relief rests in the sound discretion of the district court." *Lijoi v. Continental Cas. Co.*, 414 F. Supp. 2d 228, 247 (E.D.N.Y. 2006). That discretion is informed by two primary considerations: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether it would finalize the controversy and offer relief from uncertainty. *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969). The lack of any dispute about these factors indicates that the present motion is useful and will offer relief to the parties.

District courts may also consider: "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003). Neither of the first two concerns are present, and there does not appear to a better or more effective remedy.

## III. DISCUSSION

Plaintiff argues that the Craze Actions are not covered under the Policy because these actions do not allege a "personal or advertising injury," and thus they do not fall within the Policy's coverage. Plaintiff argues, in the alternative, that even if the Craze Actions fall within the ambit of the Policy's coverage, the "Failure to Conform" clause of the Policy expressly excludes the Craze Actions from coverage. The discussion below assumes, without deciding, that the underlying lawsuits allege a "personal and advertising injury" within the Policy's definition of that term; in particular, that they allege disparagement by defendant against the competitors of Craze. Although the word "disparage[]" as used in the Policy's definition of "personal and advertising injury" has been subject to different interpretations, the Court's conclusion that the underlying claims are excluded from coverage under the "Failure to Conform" clause makes it unnecessary to determine whether they also allege disparagement. The Second Circuit took the same approach when it affirmed *Dollar*

*Phone*, which is discussed in more detail below.[5]

## A. The Failure to Conform Exclusion

Plaintiff argues that coverage is barred by the Policy's Failure to Conform Exclusion, which states that the Policy does not apply to "'[p]ersonal and advertising injury' arising out of the failure of goods, products or services to conform with any statement of quality of performance made in your 'advertisement'" (Pl. 56.1 ¶ 5), and the Court agrees.

An insurer's duty to defend is "exceedingly broad," and the insurer "will be called upon to provide a defense whenever the allegations of the complaint suggest . . . a reasonable possibility of coverage." *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006) (internal quotation marks and citation omitted). When an insurer seeks to avoid the duty to defend based on an exclusion, the insurer "must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 77 (2d Cir. 2013) (internal quotation marks and citation omitted). In other words, "[a]n insurer seeking to avoid its obligation to defend an insured on the basis of a policy exclusion bears a 'heavy burden' . . . . [to] establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable

interpretation, and applies in the particular case." *Sea Ins. Co. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 (2d Cir. 1995) (internal quotation marks and citations omitted). "As with questions concerning coverage, questions concerning exclusions from coverage are assessed by examining the allegations in the claims asserted." *Dollar Phone Corp. v. St. Paul Fire & Marine Ins. Co.*, CV-09-1640 (DLI) (VVP), 2012 WL 1077448, at *9 (E.D.N.Y. Mar. 9, 2012) *report and recommendation adopted*, 2012 WL 1078994 (E.D.N.Y. Mar. 30, 2012), *aff'd*, 514 F. App'x 21 (2d Cir. 2013).

Here, the allegations in each of the underlying complaints plainly reveal that they are excluded from coverage, because each claim below "aris[es] out of"[6] Craze's failure to conform with Driven Sports' statements about the product's quality. In particular:

(i) The *Nutrition* complaint states that it "is a civil action arising from Defendants' false advertising and blatant misrepresentations regarding its Craze pre-workout nutritional

---

[5] The parties do not dispute that New York law governs the Court's interpretation of the Policy, as it did in *Dollar Phone*.

[6] New York state courts, as well as other courts in this circuit, have held that the phrase "arising out of" is not ambiguous, and is "ordinarily understood to mean originating from, incident to, or having connection with." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (internal quotation marks and citations omitted); *see also id.* ("The phrase requires only that there be *some* causal relationship between the injury and the risk for which coverage is provided."); *Consol. Edison Co. of New York v. Hartford Ins. Co.*, 610 N.Y.S.2d 219, 221 (1994) (stating that phrase "focuses not upon the precise cause of the accident . . . but upon the general nature of the operation in the course of which the injury was sustained").

supplement which is marketed as containing a natural extract as its active ingredient, when, in fact, it contains illegal analogs to methamphetamine." (Ex. 2 to Duffield Decl. ¶ 1.) The complaint's two causes of action (both under the Lanham Act) each claim injury based on the failure of Craze to conform with defendant's statements concerning its "nature, characteristics and qualities" (*id.* ¶ 29), and concerning its ingredients. (*Id.* ¶ 36.)

(ii) The *Olvera/Wagner* complaint is based on the allegation that Craze contains ETH, a synthetic and potentially dangerous methamphetamine (Ex. 7 to Duffield Decl. ¶¶ 51, 81), despite the fact that "Driven Sports markets Craze as containing only natural ingredients." (*Id.* ¶ 42.) The causes of action in *Olvera/Wagner* are asserted under various states' statutes, and although they address a variety of theories of recovery, including consumer protection, false advertising, unfair competition, and deceptive practices, each claim arises out of the failure of Craze to contain only natural ingredients, as promised in defendant's advertisements. (*See id.* ¶¶ 110-11 ("Defendants have misrepresented the . . . quality . . . of Craze . . . . [and] advertised Craze as containing only natural ingredients but intended to sell Craze with a synthetic methamphetamine analog."); ¶ 120 ("Defendants advertised, marketed, and otherwise disseminated information to the public through advertising mediums including the Internet statements to the effect that Craze is composed of only natural ingredients."); ¶¶ 134-35 ("Defendants have made unfair, deceptive, untrue or misleading statements in advertising mediums, including the Internet . . . . and Plaintiffs and Class members would not have purchased Craze had they known it contained an illegal substance."); ¶ 141(a) ("Defendants have misrepresented the . . . characteristics, or ingredients of Craze."); ¶ 156 ("[Plaintiffs] would not have purchased the Products but for Defendants' material omissions and affirmative acts or representations in connection with the marketing, advertising, and sale of the Products."); ¶ 161 ("Defendants have engaged in unfair, false, and misleading or deceptive acts and practices by making false and unsubstantiated representations concerning the safety, legality, and ingredients of Craze."); ¶ 168 ("Defendants concealed, suppressed, or omitted material facts."); ¶ 175 ("[I]n selling and advertising the Product, Defendants . . . . concealed, suppressed, or omitted material facts."); ¶ 182 ("Defendants knowingly misrepresented and intentionally omitted and concealed material information regarding its Product by failing to disclose to Plaintiffs and Class Members the known defects."); ¶ 196 ("Defendants represent and claim in its advertisements . . . that Craze is a dietary supplement containing only naturally occurring substances."); ¶ 211 ("Defendants [sic] deceptive conduct as defined herein, constitute violations . . . by representing that the product has approval, characteristics, and ingredients that it does not

have,"); ¶ 220 ("Defendants agreed to, and did in fact, . . . continu[e] to sell Craze to the consuming public while . . . . [d]efendants concealed, suppressed, or omitted material facts regarding the product."); ¶ 228 ("Defendants engaged in unfair and deceptive practices, including but not limited to engaging in part of a scheme or plan to sell Craze to the public without disclosing that it contained an illegal, synthetic, methamphetamine analog that has never been tested on humans."); ¶ 238 (same).)

(iii) The *Stewart* complaint is styled as "a consumer protection class action based on Defendant's failure to disclose the presence of an illegal methamphetamine analog in its 'Craze' . . . pre-workout supplement in any of its representations regarding the Product." (Ex. 8 to Duffield Decl ¶ 1.) The complaint asserts one cause of action under the Illinois Consumer Fraud Act, and one based on the implied warranty of merchantability, and each arises out of the failure of Craze to contain only natural ingredients, as promised in defendant's advertisements. (*Id.* ¶ 19 ("Plaintiff purchased 'Craze' seeking a product with the qualities represented in Defendant's advertising."); ¶ 36 ("In the course of conducting business, Defendants committed unfair or deceptive acts and practices by concealing, suppressing, or omitting material facts."); ¶ 46 ("Defendant's 'Craze' pre-workout supplement does not achieve the ordinary purposes of a pre-workout supplement in a reasonably safe manner because it

contains [a synthetic methamphetamine analog].").)

By focusing on Craze's failure to conform to defendant's own statements about it, the allegations and claims in the underlying complaints are strikingly similar to the underlying actions at issue in *Dollar Phone*, another case decided in this district and affirmed by the Second Circuit. In *Dollar Phone*, the plaintiff sought coverage for an underlying lawsuit alleging that "Dollar Phone and its codefendants defrauded their customers by failing to provide the number of minutes promised on their calling cards and in their advertisements." 2012 WL 1077448 at *1. The plaintiff in the underlying action argued that the misrepresentation created the impression that competitors' calling cards, offering fewer minutes, were overpriced. *Id.* The district court held that an exclusion nearly identical to the one here—stating that the insurer "won't cover advertising injury that results from the failure of [the insured's] products . . . to conform with advertised quality or performance"—barred coverage. 2012 WL 1077448, at *10.

The district court in *Dollar Phone* distinguished cases where similar exclusions did not apply because the underlying injury was due to misstatements about the underlying *plaintiff's* product (as opposed to the underlying *defendant's* product, which was at issue in *Dollar Phone* and here), and explained that "the harm to the [underlying] plaintiff's reputation is premised entirely on the inaccuracy of Dollar Phone's promises as to the number of minutes their cards provide . . . [which] led consumers to assume that [the underlying plaintiff's] products were inferior." *Id.* In other words, the court held that the plain language of the exclusion encompasses misstatements about

one's own product quality which injure a competitor, as opposed to misstatements about the competitor's products, which would more likely cause a "personal and advertising injury" that has nothing to do with the quality or performance of the insured's product.

On appeal, the Second Circuit affirmed *Dollar Phone*, finding "no ambiguity in the policy language, which plainly allows the insurer to disclaim coverage here.... [because] [t]he gravamen of the complaint at issue alleged in relevant part that Dollar Phone advertised calling cards that provided fewer minutes than advertised." 514 F. App'x at 22. Based upon those allegations, "[t]here [was] no question that the poor quality exclusion applies." *Id.* In so holding, the Second Circuit echoed its reasoning in a similar case under Connecticut law, where it held that a similar Failure to Conform Exclusion barred coverage for claims against a tea company that its product contained artificial flavors, despite the fact that it was marketed as "all natural." *See R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 244, 246 (2d Cir. 2002) ("Although Celestial's complaint against Bigelow included claims of false advertising, these claims did not trigger a duty to defend under the advertising injury provision because the concerned allegedly false claims about *Bigelow*'s products, and such false claims about the insured products are explicitly excluded from the policy.").

The language of the Policy here is nearly identical to the policies in *Dollar Phone* and *R.C. Bigelow*, and the "gravamen of the complaint[s] at issue" here—in fact, each claim in each complaint, as shown above— likewise alleges that Craze failed to meet its advertised quality, in a manner almost identical to what the Second Circuit considered in those cases. Like in *Dollar Phone*, where the allegation was that the actual quality of Dollar Phone's calling-card minutes did not match its advertised quality, the allegation here is that Craze's actual quality (containing a synthetic and potentially dangerous ingredient) did not match its advertised quality (containing only natural ingredients). Furthermore, Driven Sports' alleged misstatements about Craze are factually on all fours with those at issue in *R.C. Bigelow*, where, as here, the insured falsely advertised that its product was "all natural." Accordingly, the Court follows the Second Circuit's decisions in those cases, and concludes that the Failure to Conform Exclusion bars coverage here.

Defendant makes three distinct arguments for the inapplicability of the Failure to Conform Exclusion, and also has made various arguments based upon a series of post-argument "supplemental requests for judicial notice." The Court addresses each in turn and, as set forth below, finds each argument to be without merit.

1. Covered and Uncovered Claims

One of defendant's arguments suggests that there may be both covered and excluded claims in the underlying complaints, which would trigger plaintiff's obligation defend the entire action. *See CGS Indus.*, 720 F.3d at 83 (noting that "if any of the claims are covered by the policy, the insurer consequently has a duty to defend the entire action"). Defendant relies on *R.C. Bigelow* as an example of such a holding, where the Second Circuit found the duty to defend triggered by other claims, besides the ones that it held were excluded. 247 F.3d at 248-49. *Dollar Phone* is distinct, in defendant's view, because it dealt with underlying allegations that were "premised *entirely on*

the inaccuracy of Dollar Phone's promises as to the number of minutes their cards provide," 2012 WL 1077448 at *10 (emphasis added), without any covered claims in the underlying complaints. Here, defendant contends that the underlying allegations are not premised *entirely* on Craze's quality or performance, but also on whether defendant disparaged its competitor's product in a manner that creates a separate claim not covered by the Failure to Conform Exclusion.

The Second Department of the New York Appellate Division recently noted that, when an insured makes this argument concerning partially covered and partially uncovered underlying claims, the question is whether the plaintiffs in the underlying action would be able to prove the allegedly covered claim without proving the uncovered claim. *See Natural Organics, Inc. v. OneBeacon Am. Ins. Co.*, 102 A.D.3d 756, 759, 959 N.Y.S.2d 204 (N.Y. App. Div. 2d Dep't 2013).

Here, the Court's exposition *supra* of each individual underlying claim shows that none of them could be proven without proving that Craze failed to conform with defendant's advertisements about its quality. *Cf. U.S. Underwriters Ins. Co. v. Val-Blue Corp.*, 85 N.Y.2d 821, 823 (1995) (holding that "[t]he plethora of claims surrounding [the underlying plaintiff's] injury . . . are all 'based on' [the excluded assault and battery] without which [the underlying plaintiff] would have no cause of action").[7] As such,

each of them plainly arises out of—meaning "originating from, incident to, or having connection with," *Fed. Ins. Co.*, 639 F.3d at 568—the allegation that defendant placed an illegal and potentially dangerous synthetic ingredient into Craze while advertising that it contained only natural ingredients.

Defendant argues that its statements on the Craze website compare Craze favorably to other products generally and disparage those other products, thus giving rise to freestanding disparagement claims regardless of whether Craze contained a synthetic ingredient. This argument lacks

---

[7] The Court observes that the insured in *U.S. Underwriters* had a stronger case for coverage because there was sharper distinction between the exclusion and the underlying claims: the underlying claims alleged negligence, while the exclusion addressed assault and battery. 85 N.Y.2d at 822.

Still, the Court found the claims to be excluded, and reaffirmed that decision the following year. *See Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (1996) ("Similarly, though Hunter's claim sounds in negligence, the theory she asserts has little to do with whether the injury sought to be compensated was based on an assault excluded under the policy. Instead, the language of the policy controls this question and while the theory pleaded may be the insured's negligent failure to maintain safe premises, the operative act giving rise to any recovery is the assault. While the insured's negligence may have been a proximate cause of plaintiff's injuries, that only resolves its liability; it does not resolve the insured's right to coverage based on the language of the contract between him and the insurer. Merely because the insured might be found liable under some theory of negligence does not overcome the policy's exclusion for injury resulting from assault."). Thus, it is evident that, under New York law, the Court's focus in this situation must remain on whether the injury alleged in the underlying actions arose out of the excluded conduct, because that is the question under the Policy, which does not ask which legal theory the insured uses to characterize the underlying allegations. *Accord Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 68 (1991) ("While the allegations in the complaint may provide the significant and usual touchstone for determining whether the insurer is contractually bound to provide a defense, the contract itself must always remain a primary point of reference.").

force unless defendant can link these website statements to the underlying allegations in the Craze Actions. *See Dollar Phone*, 2012 WL 1077448, at *9 ("[Q]uestions concerning exclusions from coverage are assessed by examining the allegations in the claims asserted.") However, a search of the underlying complaints yields no references to these website postings; the only references to them are in defendant's moving papers. Although the complaints make vague references to "disparagement" as a prohibited act under certain state statutes, and also refer generally to defendant's internet marketing, one need only read the underlying allegations to see that they nonetheless all arise from Craze's failure to conform with its advertised quality.

For that reason, the website is not extrinsic evidence which may give rise to coverage even if it is not referenced in the underlying allegations. *See, e.g.*, *Fitzpatrick*, 78 N.Y.2d at 63. Even if one attributes knowledge of the website to plaintiffs in the Craze Actions based upon the extrinsic evidence provided by defendant, that extrinsic evidence cannot create underlying claims which are not asserted, and which defendant has not shown are ever likely to be asserted in this litigation. Defendant simply has not shown that there is any injury to an underlying plaintiff that did not arise out of Craze's failure to conform with statements about its quality, and instead resulted purely from some negative comparison made by defendant in advertising Craze. Such an injury would have to exist *even if* Craze had performed as advertised, and contained only natural ingredients. However, under that scenario, the underlying plaintiff would have no claim, because the comparison between Craze and its competitors would be based upon true facts. As the Supreme Court of North Carolina explained:

> There is a distinction between being injured by an advertisement and being injured by a product's failure to perform as advertised. . . . However, there is also a distinction between being injured by an advertisement and being *wrongfully* injured by an advertisement. . . . Thus, even though [the underlying plaintiff] suffers the same type of injury whether or not the advertisement is false, [the underlying plaintiff] may only recover damages on account of its injury when the advertisement is false. The remedy for the injury inflicted by a truthful advertisement is found in the marketplace, not in the courthouse.

*Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 692 S.E.2d 605, 614 (N.C. 2010).

Thus, as much as defendant attempts to re-brand the underlying claims as advertising injuries, they plainly arise out of how Craze actually performed, which left its consumers exposed to an allegedly dangerous and synthetic substance, and its competitors unable to compete. (Ex. 2 to Duffield Decl. ¶¶ 16-17, 33, 39-40.) The gravamen of the *Nutrition* complaint is not that defendant's advertising made its competitor's product *appear* inferior, either by explicit or implicit statements, but instead that Craze *actually was* a more potent product, which left the *Nutrition* plaintiff unable to compete. (Ex. 2 to Duffield Decl. ¶¶ 16-17.) The difference in potency is alleged to be the result of Craze's failure to conform with defendant's

advertisements that it contained only natural ingredients. (*Id.* ¶¶ 17, 33, 39-40.) In other words, the crux of the *Nutrition* action is that Driven Sports obtained an unfair competitive advantage by making misrepresentations about Craze's ingredients. It is alleged that Driven Sports would not have been able to obtain this competitive advantage if its consumers had known the truth about the contents of Craze. Neither the competitors nor the consumers could prove these injuries without proving that Craze failed to conform to defendant's advertising about its quality. Therefore, the Court concludes that all of the underlying claims are excluded, and there are no potentially covered claims.

2. Statements About One's Own Product versus the Product of One's Competitor

Defendant also makes a closely-related second argument which draws on cases outside of New York involving the distinction, discussed in *Dollar Phone*, between statements about one's own products and the products of one's competitor. In those cases, courts found that the underlying complaints alleged misrepresentations about the competitor's product, which made the injuries different than the "failure to conform" captured by the quality exclusions. For example, in *E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.*, the Court noted that the underlying claims were "not related to the performance of Plaintiff's products" because they were "based on alleged trade libel committed by Plaintiff, with respect to negative comparisons Plaintiff made about competitors vis-à-vis Plaintiff's products."

590 F. Supp. 2d 1244, 1248 n.5 (N.D. Cal. 2008).[8]

Likewise, in *Safety Dynamics, Inc. v. Gen. Star Indemnity Co.*, an unpublished Ninth Circuit case which defendant relies upon even more heavily than *E.piphany*, the court distinguished between a "failure of goods" and a "failure of advertising." 475 F. App'x 213, 214 (9th Cir. 2012). The court did not offer an explanation for that distinction (other than a citation to an insurance law treatise), and as plaintiff

---

[8] The Court also notes that *E.piphany* was decided before the California Court of Appeal decided *Total Call Int'l, Inc. v. Peerless Ins. Co.*, which the Second Circuit cited approvingly when it affirmed *Dollar Phone*. *See* 514 F. App'x at 22 (citing 181 Cal. App. 4th 161, 172 (Cal. Ct. App. 2010)). *Total Call* and *Dollar Phone* involved very similar underlying allegations that phone cards did not contain the advertised number of minutes, and the exclusion in *Total Call* is identical to the one in the Policy in this case. 181 Cal. App. 4th at 165. Like *Dollar Phone*, *Total Call* held that the underlying complaints did not fit under the "advertising injury" line of cases, because they did not describe disparaging statements about competitor's products, but instead statements about the insured's own products, and the failure of the insured's products to conform with the advertised quality. *Id.* at 171. Accordingly, the court concluded that the failure to conform exclusion barred coverage, citing analogous cases from the Seventh and Eighth Circuits (which were also cited in *Dollar Phone*, 2012 WL 1077448, at *10), and from the Eastern District of Virginia. *See* 181 Cal. App. 4th at 172 (citing *Skyline Techs., Inc. v. Assurance Co.*, 400 F.3d 982, 984 (7th Cir. 2005); *New Hampshire Ins. Co. v. Power-O-Peat, Inc.*, 907 F.2d 58, 58-59 (8th Cir. 1990); *Superformance Int'l v. Hartford Cas. Ins.*, 203 F. Supp. 2d 587, 589-90 (E.D. Va. 2002)). Although the *E.piphany* Court denied reconsideration after *Total Call*, *see Infor Global Solutions (Mich.) Inc. v. St. Paul Fire & Marine Ins. Co.*, 686 F. Supp. 2d 1005, 1007 (N.D. Cal. 2010), the reasoning of *Total Call* was later affirmed by the Supreme Court of California. *See Hartford Cas. Ins. Co. v. Swift Distrib, Inc.*, 326 P.3d 253 (Cal. 2014).

notes, it does not appear that New York law recognizes such a distinction, but the Ninth Circuit did suggest that the failure-to-conform exclusion did not apply because "[t]he [underlying] complaint alleges that Safety Dynamics's false claims about its own product . . . made Safety Dynamics's product look better versus ShotSpotter's." *Id.*

The opinions in *Safety Dynamics* and *E.piphany* are not instructive here, because those cases contain, in each instance, no more than a sentence discussing a failure to conform clause. Moreover, to the extent that these cases are in tension with the Second Circuit's holdings in *Dollar Phone*[9] and *Bigelow*, this Court is bound to follow the Second Circuit's caselaw, and does so here.

3. Whether "Quality" is Vague

Defendant also argues against the applicability of the exclusion by characterizing the language of the exclusion itself as vague, suggesting that the words "'quality or performance' do[] not include a statement that the product has the characteristic of including certain ingredients." (Def. Mem. Opp. at 9.) In other words, defendant contends that the fact that Craze was advertised to contain only natural ingredients, but actually contained an illegal and potentially dangerous methamphetamine analog, does not unambiguously relate to Craze's "quality or performance," such that plaintiff cannot carry its burden to show that the only interpretation of those words includes a product's ingredients. Although it is true, as noted above, that "exclusions are subject to strict construction and must be read narrowly," *Cook*, 7 N.Y.3d at 137, the Second Circuit (applying New York law) has "decline[d] to obligate an insurer to extend coverage based on a reading of the complaint that is linguistically conceivable but tortured and unreasonable." *State of N.Y. v. AMRO Realty Corp.*, 936 F.2d 1420, 1428 (2d Cir. 1991); *see also Metro Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *Paul K. Rooney, P.C. v. Chicago Ins. Co.*, 00 CIV. 2335 (JGK), 2001 WL 262703, at *7 (S.D.N.Y. Mar. 16, 2001), *aff'd sub nom. Rooney v. Chicago Ins. Co.*, 26 F. App'x 53 (2d Cir. 2001) ("This is consistent with the principle of New York law that contracts are to be given their reasonable interpretation and are not to be construed in a strained or tortuous fashion.").

The Court concludes that it is a tortured and unreasonable reading of both the underlying complaints and the Policy to contend that Craze's ingredients are not a "quality" of the product. Under any reasonable definition of "quality," the presence of an illegal and dangerous synthetic substance is a failure to conform with the product's advertised "quality," when the advertisements stated that it

---

[9] In particular, this Court finds it difficult to reconcile *Safety Dynamics* with *Dollar Phone*. Although the Ninth Circuit's summary opinion in *Safety Dynamics* makes no mention of the underlying facts, the district court's opinion in that case presents a strikingly similar fact pattern to the scenario at issue in *Dollar Phone*. In *Safety Dynamics*, a competitor claimed that a gunshot-sensor system falsely advertised the potency and efficacy of its sensors, which gave the company an unfair competitive advantage by claiming that a consumer required fewer sensors, and that therefore its product was less expensive than its competitors. *See Safety Dynamics v. Gen. Star Indem. Co.*, No. 09-CV-695 (D. Ariz. March 4, 2011).

contained only natural ingredients.[10] Therefore, the Court concludes that there is no reasonable basis for a difference of opinion concerning the meaning of "quality" as used in the Failure to Conform Exclusion, and it is unambiguous as a matter of law. *See Metro Life Ins.*, 906 F.2d at 889.

### 4. Supplemental Submissions

Following oral argument, Driven Sports submitted several filings entitled "supplemental requests for judicial notice." In particular, these supplemental submissions provide various materials from the underlying Crave Actions -- including, *inter alia*, deposition testimony, discovery responses, and a preliminary injunction motion -- in an effort to further support their position that plaintiff has a duty to defend

under the Policy. Plaintiff opposes these supplemental submissions on several grounds. First, plaintiff correctly notes that, in July 2014, Driven Sports sought leave to file a motion for summary judgment, representing to the Court that "[n]o genuine issues of material fact bar adjudication" of the issues in the case, and "[t]he case is therefore properly positioned for a judgment on the issues as a matter of law." (ECF No. 10 at 2.) Plaintiff also argues that several exhibits in these supplemental filings pre-dated the oral argument and could have been brought to the Court's attention at an earlier time. Second, plaintiff contends that certain portions of these supplemental filings are not properly the subject of judicial notice because there is no evidence that the discovery materials were filed in any court. Third, plaintiff argues that the supplemental evidence and arguments have no merits. The Court need not address plaintiff's procedural and evidentiary objections because, even having fully considered the materials and arguments in the post-argument filings by defendant, the Court concludes that they do not alter the Court's determination that there is no duty to defend the underlying lawsuits because of the quality exclusion in the Policy.

Having reviewed these supplemental materials from the underlying lawsuits, the Court concludes that nothing in those materials undermines this Court's determination that the underlying lawsuits are all premised on the core allegation that Craze, contrary to its labeling and Driven Sports' advertising, contains methamphetamines. For example, Exhibit 120 is a discovery request asking the *Nutrition* action plaintiff to "[d]escribe all facts supporting YOUR contention that 'Craze' was far more potent than any other pre-workout supplement on the market."

---

[10] The primary case on which defendant relies to suggest that "quality" is inapplicable or ambiguous is factually distinguishable, even if one assumes that New York courts would have decided that case the same way. In *Jewelers Mut. Ins. v. Milne Jewelry Co.*, a jeweler advertised its products as being of authentic Native American origin, and faced underlying litigation related to, among other things, the accuracy of that claim. No. 2:06-CV-243 (TS), 2006 WL 3716112, at *1-3 (D. Utah Dec. 14, 2006). The court concluded that a failure to conform exclusion similar to the one in this case did not bar coverage because the term "quality" was susceptible to more than one meaning, and the parties disputed whether it embraced the origin of the products or merely their "fitness." *Id.* at *3. Here, the nature of the underlying allegations would not support a similar distinction. Any reasonable definition of "quality" includes whether the product at issue contains an illegal and potentially dangerous synthetic drug. *See Rooney*, 2001 WL 262703, at *5 ("Under New York law, the terms of an insurance policy are to be interpreted in light of their natural and reasonable meaning corresponding to the reasonable expectation and purpose of the ordinary businessman.").

(ECF No. 40-2.) In response, plaintiffs state that Craze "contains methamphetamine-analogs," and point to Craze user comments. Similarly, in the preliminary injunction motion in *Nutrition*, the plaintiff unequivocally focuses upon Driven Sports' statements about the ingredients in its own product: "Craze's labels include misleading statements and designations that create the false impression that Craze is an 'all natural' dietary supplement with Dendrobex acting as [] its active ingredient, while egregiously omitting that it contains designer drugs that are the structural analogues of methamphetamine." (ECF No. 43-1 at 17.) Moreover, it is clear from the motion that any economic harm resulting from the comparison between the two products by consumers, including performance, all arise from this alleged deception regarding the ingredients: "[T]he Craze product labels inaccurately represent the active ingredients and fail to list the presence of methamphetamine analogs. Thus, when Craze is compared to Plaintiff's 'SuperSize' pre-workout product, Driven Sports' product appears safer and more effective than Plaintiff's product – when, in fact, the FDA found Craze to be 'adulterated' under the Federal Food, Drug, and Cosmetic Act (the "FDCA"). As a result of Driven Sports' ongoing efforts to manufacture, market and sell Craze, Plaintiff is continuing to lose sales and the opportunity to establish and strengthen its own brand through its legitimate business efforts." (*Id*. at 9.) In addition, the deposition testimony of Kevin Smith is completely consistent with the allegations that are contained in the *Nutrition* complaint. In opposition to the supplemental submission regarding the Smith deposition, plaintiff argues the following:

Nutrition complains that Driven Sports failed to disclose the (alleged) presence of methamphetamine in its Craze product. Nutrition contends that it was damaged by the omission because customers achieved results from Craze that were superior to those from Nutrition's "Supersize" product, but no one knew that the superior results derived from Craze's illegal ingredients. Nutrition further seeks to restrain Driven Sports from using the "Craze" name to maintain a competitive advantage over Nutrition based on customers' positive impressions of Driven Sports' allegedly effective but illegal product….[B]ecause the harm arises out of Driven Sports' statements about its own product, the Failure to Conform Exclusion would bar coverage in any event.

(ECF No. 48 at 2-3) (footnote omitted). This Court agrees with plaintiff's argument for the reasons discussed *supra*.

In short, none of these supplemental excerpts submitted by defendant from the discovery materials and motions in the underlying lawsuit demonstrate that any of the plaintiffs are making any claims unrelated to the alleged ingredients in Craze. In other words, it is abundantly clear that the underlying actions were brought, and continue to be litigated, over the alleged false and misleading statements by Craze about its ingredients, and the alleged injuries resulting therefrom. Therefore, having carefully reviewed the supplemental submissions following oral argument, the Court does not believe that these submissions alter the Court's conclusion that the Failure to Conform Exclusion bars coverage in connection with the underlying

Craze actions. Thus, General Star has no duty to defend or indemnify[11] Driven Sports in the Craze Actions.

## B. Recoupment

Plaintiff also argues that, because the underlying claims are excluded from the Policy, it should be able to recoup its costs in representing defendant to this point in the underlying litigation. Although plaintiff cites several cases in which New York courts mention the possibility of recoupment in dicta,[12] courts actually awarded recoupment in only four of those cases. In two of those, the request for recoupment appears to have been unopposed. *See Amer. Family Home Ins. Co. v. Delia*, No. 12-cv-5380 (ADS)(WDW), 2013 WL 6061937, at *2 (E.D.N.Y. Nov. 15, 2013) (awarding recoupment as part of a default judgment); *Max Specialty Ins. Co. v. WSG Investors, LLC*, No. 09-CV-05237 (CBA)(JMA), 2012 WL 3150579, at *9 (E.D.N.Y. Apr. 20, 2012), *report and recommendation adopted at* 2012 WL 3150577, at *4 (E.D.N.Y. Aug.

2, 2012) (noting lack of objection to recoupment award). In the third, the court awarded recoupment based on the lack of evidence that the insured refused to consent to the insurer's reservation of the right to seek recoupment. *See Gotham Ins. Co. v. GLNX, Inc.*, No. 92 Civ. 6415 (TPG), 1993 WL 312243, at *4 (S.D.N.Y. Aug. 6, 1993). The fourth case also noted the reservation of rights, and although it provided no discussion of the effect of that reservation, its only citation on the matter was to a case where the reservation of rights was unopposed. *See Certain Underwriters at Lloyd's London Subscribing to Policy No. SYN-1000263 v. Lacher & Lovell-Taylor, P.C.*, 112 A.D.3d 434, 435, 975 N.Y.S.2d 870 (N.Y. App. Div. 2013) (citing *Am. Guar. & Liab. Ins. Co. v. CNA Reins. Co.*, 16 A.D.3d 154, 155, 791 N.Y.S.2d 525 (N.Y. App. Div. 2005)).

Thus, although some courts have awarded recoupment, it is unclear under New York law whether that remedy is appropriate, or even authorized, under these circumstances, where defendant effectively resisted the idea of recoupment from the very beginning by rejecting plaintiff's offer of a separate recoupment agreement. In the absence of any clear guidance from the New York courts, this Court must predict how the New York Court of Appeals would address this question. *See Travelers Ins. Co. v. 633 Third Associates*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity.").

The relevant New York law under consideration is unjust enrichment, because plaintiff's argument for recoupment is not

---

[11] The policy is written such that the Failure to Conform Exclusion excuses both the duty to defend and the duty to indemnify. The Failure to Conform clause specifies that "this insurance will not apply" if the clause's conditions are met. Because the Court has determined that the clause applies, the policy no longer applies, and consequently plaintiff has no duty to defend or indemnify.

[12] In its reply brief, plaintiff cites a number of cases where the possibility of recoupment is mentioned, but not awarded. *See XL Specialty Ins. Co. v. Level Global Inv., L.P.*, 874 F. Supp. 2d 263, 282, 292 (S.D.N.Y. 2012); *U.S. Specialty Ins. Co. v. Liberty Partners L.P.*, No. 11 Civ. 3736 (HB), 2011 WL 5428971, at *5 (S.D.N.Y. Nov. 8, 2011); *Dupree v. Scottsdale Ins. Co.*, 947 N.Y.S.2d 428, 429 (N.Y. App. Div. 2012); *Fed. Ins. Co. v. Kozlowski*, 792 N.Y.S.2d 397, 404 (N.Y. App. Div. 2005); *Trs. of Princeton Univ. v. Nat'l Union Fire Ins. Co. of Pgh, Pa.*, 839 N.Y.S.2d 437 (N.Y. Sup. Ct. 2007).

based in the text of the Policy itself. It is undisputed that no provision of the Policy explicitly grants plaintiff the right to seek recoupment. Instead, plaintiff argues that defendant would be unjustly enriched by legal representation to this point in the underlying cases, where it has been held that the claims in those cases are excluded from the Policy.

However, the fact that the Policy does not explicitly provide for recoupment does not mean that it is silent concerning who bears the costs of legal representation, and New York law generally precludes claims of unjust enrichment where a contract covers the "particular subject matter" at issue. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009). The Policy is an extensive, detailed contract governing the particular subject matter of coverage for claims against defendant: in particular, the Policy's Supplementary Payments provision states that plaintiff "will pay, with respect to . . . any 'suit' against an insured . . . [a]ll expenses we incur." (Ex. 1 to Duffield Decl.) As is discussed *infra*, plaintiff agrees that this provision covers legal expenses.[13]

Therefore, this was the provision in which plaintiff could have contracted for a right to seek recoupment, but it did not do so. This Court is obliged, under New York law, to interpret the Policy as it is written in keeping with an average insured's reasonable expectations, *see Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011). The Policy says "[a]ll expenses." Plaintiff cannot now qualify that term by relying on a quasi-contract theory. *See* Angela R. Elbert and Stanley C. Nardoni, *Buss Stop: A Policy Language Based Analysis*, 13 Conn. Ins. L.J. 61, 95-97 (2006-2007) ("Allowing the insurer to shift defense costs back to the insured through reimbursement would contravene the [expenses] clause's express promise that the insurer will pay them. . . . Quasi contractual remedies . . . are not designed to overcome such express contractual terms. . . . The promise to bear all expenses in the cases the insurer defends weighs heavily against the right of recoupment.")

Alternatively, the Court concludes that, even applying the test for unjust enrichment

---

[13] To the extent that plaintiff argues that the Policy does not cover the defense of an excluded claim, the provision does not make that distinction on its face. Furthermore, "[t]he problem with this argument is that [the insurer] is attempting to define its duty to defend based upon the outcome of the declaratory judgment action. Although an insurer's duty to indemnify arises only after damages are fixed, the duty to defend arises as soon as damages are sought." *Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1103 (2005); *see also Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 542 n.14 (Pa. 2010) ("Royal's obligation to pay, with respect to 'any suit against an Insured we defend . . . [a]ll expenses we incur' arguably answers the question before us. Here, Royal defended Insured. It was, therefore, contractually obligated to pay all defense expenses it incurred. Regardless of whether it

was obligated to defend Insured pursuant to the insurance contract, it did, in fact, provide a defense. Under the plain language of the contract, therefore, it was obligated to pay for the expenses it incurred in connection with the defense, an obligation that would be eviscerated if Insured had to reimburse Royal."). The Second Circuit, applying New York law, has likewise noted that the duty to defend arises *ex ante*, even when there is uncertainty concerning the underlying claims. *See Bridge Metal Indus., LLC v. Travelers Indem. Co.*, 559 F. App'x 15, 18 (2d Cir. 2014). Notably, in *Bridge Metal*, the Second Circuit found that the *ex ante* situation was uncertain, triggering the duty to defend, even where (as here) only a "handful" of cases supported the insured's position. *Id.*

under New York law, plaintiff's argument is unpersuasive. "It is well settled that '[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'" *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215, (2007) (quoting *Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y.2d 415, 421 (1972)). In addition, under the theory of unjust enrichment, "[a] party will not be relieved of the consequences of his own failure to proceed with diligence or to exercise caution with respect to a business transaction." *Charles Hyman, Inc. v. Olsen Indus., Inc.*, 642 N.Y.S.2d 306, 311 (1996).

As other courts have noted, plaintiff bears the risk of not providing for recoupment in the Policy itself, and plaintiff is not saved by its later, unilateral reservation of rights.[14] *See, e.g.*, *National Sur. Corp. v. Immunex Corp.*, 297 P.3d 688, 694 (Wash. 2013) ("[A]llowing recoupment to be claimed in a reservation of rights letter would allow the insurer to impose a condition on its defense that was not bargained for."); *Jerry's Sports Ctr.*, 2 A.3d at 544 ("Where the insurance contract is silent about the insurer's right to reimbursement of defense costs, permitting reimbursement for costs . . . . would amount to a retroactive erosion of the broad duty to defend."); *Shoshone First Bank v. Pac. Emps. Ins. Co.*, 2 P.3d 510, 515 (Wy. 2000) ("The insurer is not permitted to unilaterally modify and change policy coverage."). Plaintiff's awareness of this risk is suggested by its attempt to provide for recoupment in a separate agreement after defendant tendered its claims. Defendant rejected that offer, and, as a matter of equity and good conscience, the Court will not now imply the same agreement into the Policy.

To hold otherwise would risk eroding the well-established doctrine under New York law of imposing an "exceedingly broad" duty to defend on insurers. *Cook*, 7 N.Y.3d at 137. New York law recognizes that "a provision for defense of suits is useless and meaningless unless it is offered when the suit arises," *Fitzpatrick*, 78 N.Y.2d at 70 (internal quotation marks and citation omitted), and thus requires an insurer to "come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Id.* (internal quotation marks and citation omitted). As it operates now, this rule incentivizes an insured to seek coverage, but if insurers can threaten the later collection of costs, an insured's incentives would change drastically, and he would be faced with a "Hobson's choice" in any close case. In other words, an insured whose claim *might* be covered could be dissuaded from seeking coverage out of concern that the legal costs would be so prohibitive that the insured could never pay them if a court later disagreed. *See Immunex*, 297 P.3d at 695 (citing *Midwest*

---

[14] Although the parties dispute which is the majority rule in other jurisdictions, both parties referred to an article published by the American Bar Association in 2011, noting that "[t]here is a fairly even split among state and federal courts" concerning recoupment. Bob Allen, Gary Thompson, and Sara M. Thorpe, *Reversing Course: Can an Insurer Seek Reimbursement from its Policyholder for Amounts Related to Noncovered Claims?*, at 3, accessed at https://apps.americanbar.org/litigation/committees/insurance/docs/2011-cle-materials/11ReimbursementPaymentClaims/11aReversingCourseCanInsurer.pdf. However, as the title of that article suggests, there has been a recent trend toward courts rejecting claims for recoupment. *Id.*; *see also Immunex*, 297 P.3d at 693 ("More recently, however, courts deciding in the first instance whether insurers can recover defense costs have generally concluded that they cannot.").

*Sporting Goods*, 828 N.E.2d at 1102). Thus, the insured would lose the benefit of his bargain with the insurer, which the insured struck believing that the insurer was obligated to defend him, at least initially, even in the most borderline cases. A judicial alteration of that contractual balance, without any Policy language justifying such an outcome—and, in fact, with Policy language promising that the insurer will pay all expenses— is contrary to the "reasonable expectations of the average insured," *Cragg*, 17 N.Y.3d at 122, and to the related principle in New York law that "[i]f the terms of a policy are ambiguous . . . any ambiguity must be construed in favor of the insured and against the insurer." *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).

Furthermore, awarding recoupment in this case would effectively make the duty to defend coextensive with the duty to indemnify, despite the fact that New York courts have repeatedly held that the duty to defend is broader. "The duty to defend arises whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be." *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310 (1984) (internal quotation marks and citations omitted). "Though policy coverage is often denominated as liability insurance, where the insurer has made promises to defend it is clear that [the coverage] is, in fact, litigation insurance as well." *Id.* In this sense, an insurer contracts with an insured to defend more than the policy obligates the insurer to ultimately pay. *Fitzpatrick*, 78 N.Y.2d at 65 ("[A]s the rule has developed, an insurer may be contractually bound to defend even though it may not ultimately be bound to pay, either because its insured is not

factually or legally liable or because the occurrence is later proven to be outside the policy's coverage."). Allowing plaintiff to recoup its costs would effectively require that insurers only defend to the same extent that they must ultimately indemnify.

It is also relevant to the Court's consideration of equity and good conscience that an insurer receives some benefit from undertaking a defense, even if it believes the claims are excluded. "When an insurer defends under a reservation of rights, it insulates itself from potential claims of breach and bad faith, which can lead to significant damages, including coverage by estoppel[15]. . . . Conversely, when an insurer declines to defend altogether, it saves money on legal fees but assumes the risk it may have breached its duty to defend or committed bad faith." *Immunex Corp.*, 297 P.3d at 693-94; *see also Jerry's Sport Ctr.*, 2 A.3d at 545 ("Insured was not unjustly enriched by Royal's payment of defense

---

[15] Although plaintiff cites a recent decision of the New York Court of Appeals for the proposition that coverage by estoppel is not available under New York law, plaintiff would still have an incentive to defend this suit because of the possibility of suit for bad faith or breach of contract, and because it would want to ensure the quality of representation. Furthermore, the holding in *K2 Inv. Grp., LLC, v. Amer. Guar. & Liability Ins. Co.*, which allows insurers who wrongly fail to defend and then face claims for indemnification to argue that coverage was excluded by the terms of the policy, is not inconsistent with this Court's holding that recoupment is an inappropriate remedy in this case. 22 N.Y.3d 578, 586-87 (2014). The duty addressed in *K2* is the duty to indemnify, while this case concerns the broader duty to defend. If anything, *K2* reinforces the distinction between those two duties, because the Court concluded that the insurer undoubtedly breached its duty to defend, even if there was a genuine dispute of fact concerning its duty to indemnify. *Id.* at 584.

costs. Royal had not only the duty to defend, but the right to defend under the insurance contract. This arrangement benefited both parties. The duty to defend benefited Insured to protect it from the cost of defense, while the right to defend allowed Royal to control the defense to protect itself against potential indemnity exposure."); *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1219-20 (3d Cir. 1989) ("Faced with uncertainty as to its duty to indemnify, an insurer offers a defense under reservation of rights to avoid the risks that an inept or lackadaisical defense of the underlying action may expose it to if it turns out there is a duty to indemnify. At the same time, the insurer wishes to preserve its right to contest the duty to indemnify if the defense is unsuccessful. Thus, such an offer is made at least as much for the insurer's own benefit as for the insured's. If the insurer could recover defense costs, the insured would be required to pay for the insurer's action in protecting itself against the estoppel to deny coverage that would be implied if it undertook the defense without reservation."). Given these potential benefits for the insurer in fulfilling its duty to defend, other "courts have . . . [found] that concerns of equity and fairness weigh against reimbursement, because an insurer benefits unfairly if it can hedge on its defense obligations by reserving its right to reimbursement while potentially controlling the defense and avoiding a bad faith claim." *Jerry's Sport Ctr.*, 2 A.3d at 539.

For these reasons, even if plaintiff's claim of unjust enrichment is not precluded by the Policy, the Court holds that defendant was not unjustly enriched by plaintiff's coverage of legal representation. Under these circumstances, the Court finds that the New York Court of Appeals would find recoupment to be an inappropriate remedy.

## C. Self-Liquidation

However, the Court agrees with plaintiff that the Policy is self-liquidating, such that plaintiff's expenses in defending the underlying actions count against the Policy's limit of liability. This result is compelled by the Policy's plain language, which defines plaintiff's "Supplementary Payments," to include "[a]ll expenses" incurred by plaintiff in defending the underlying lawsuits. (Pl. 56.1 ¶ 6.) Immediately following the definition of "Supplementary Payments," the Policy states in bold, capital letters that:

> **THESE PAYMENTS, EXCLUSIVE OF SALARIES AND EXPENSES OF OUR OWN EMPLOYEES, WILL REDUCE THE LIMITS OF INSURANCE.**

(*Id.*) Thus, no reasonable factfinder could conclude anything other than that plaintiff's "Supplementary Payments," which include defense expenses, reduce the limits of the Policy.

Defendant argues that the Policy should have been clearer concerning whether attorneys' fees were included in "Supplementary Payments." The definition of "Supplementary Payments," however, includes "[a]ll expenses" incurred "with respect to any claim we investigate or settle or any 'suit' against an insured we defend."[16] (*Id.*) That definition may be

---

[16] The Court also notes that the Supplementary Payments provision, in a section that discusses coverage for indemnitees, specifically references "attorney's fees" as a type of Supplementary Payment. (*See* ECF No. 19-5 at 43 ("So long as the above conditions are met, attorneys' fees incurred by

broad, but it is not ambiguous. *Cf. Emps. Reins. Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 768 (10th Cir. 2004) ("A plain reading of the supplementary payments provision indicates that it covers [attorneys' fees] . . . . The provision provides that [the insurer] will pay all expenses which it incurs with respect to any claim that it *investigates.* Certainly, [the insurer] investigated the claims for which it litigated coverage. Moreover, the fees and expenses which [the insurer] incurred . . . are expenses which it incurred with respect to such claims. Accordingly, the declaratory judgment fees and expenses fall within the plain and ordinary meaning of the supplementary payments provision."); *Commercial Underwriters Ins. Co. v. Royal Surplus Lines Ins. Co.*, 345 F. Supp. 2d 652, 671-72 (S.D. Tex. 2004) (holding that attorneys' fees fell under similar "all expenses" definition of Supplementary Payments); *Dotson v. Chester*, No. 94-1194, 1994 U.S. App. LEXIS 28279, at *13 (4th Cir. 1994) (interpreting the phrase "all expenses" in an insurance contract to include attorney's fees). In fact, as was discussed *supra*, the lack of ambiguity in that statement convinces the Court that plaintiff's claim of unjust enrichment must fail, because the "[a]ll expenses" provision covers the subject matter at issue, thereby precluding recovery under a quasi-contractual theory.

The cases defendant cites are not to the contrary. In *In re East 51st Street Crane Collapse Litigation*, the Appellate Division held that a similar policy was ambiguous because it stated that the limits of coverage

---

us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments.").)

were reduced only by "the payment of judgment or settlements." 960 N.Y.S.2d 364, 366 (N.Y. App. Div. 2013). Here, the equivalent provision states that the limits are reduced by "the payment of judgments, settlements, or Supplementary Payments." (Pl. 56.1 ¶ 3.) Thus, there is no question here that "Supplementary Payments" may reduce the limits of coverage. The question is simply whether the Policy adequately defines "Supplementary Payments" to include attorney's fees, and the Court holds that it does.[17] If "Supplementary Payments" includes "[a]ll expenses," then it must include all that plaintiff spends, of which the cost of providing legal representation to defendant is a major component. Under the Policy's plain language, that cost reduces the limits of the Policy's coverage.

IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted in part and denied in part. More specifically, plaintiff's motion is granted to the extent it seeks a declaratory judgment that (1) General Star has no duty to defend or indemnify Driven Sports in the underlying Craze Actions, and (2) the limits of liability of the Policy are reduced by the amount of any defense payments for the Craze Actions

---

[17] Defendant also cites two cases from other jurisdictions, but both are distinguishable based upon the language of the policies at issue. In *Flowers v. Max Specialty Ins. Co.*, the definition of "supplementary payments" stated that such payments would not reduce the limits of insurance, unlike here, where the reduction is expressly stated. 761 S.E.2d 787, 792 (W. Va. 2014). In *Ill. Union Ins. Co. v. N. Country Ob-Gyn Med. Grp., Inc.*, the court reviewed an arbitration panel's interpretation of the words "incurred by the insureds," which are not at issue here. No. 09CV2123 (LAB) (JMA), 2010 WL 2011522, at *3-5 (S.D. Cal. 2010).

not repaid to General Star. However, plaintiff's motion is denied to the extent it seeks a declaratory judgment that General Star is entitled to recoup all amounts paid for defense of the Craze Actions. Defendant's motion for partial summary judgment is granted to the extent that General Star has no right to recoup from Driven Sports all defense expenses for the Craze Actions. However, the defendant's motion is denied in all other respects. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: January 23, 2015
        Central Islip, NY

* * *

Plaintiff is represented by Cara T. Duffield and John Howell of Wiley Rein LLP, 1776 K Street NW, Washington, DC 20006; and Vincent Proto of Budd Larner, 150 John F. Kennedy Parkway, Short Hills, NJ 07078. Defendant is represented by David A. Gauntlett and James A. Lowe, Gauntlett & Associates, 18400 Von Karman, Suite 300, Irvine, CA 92612; and Eugene Killian, Jr., Killian & Salisbury, P.C., 555 Route 1 South, Suite 430, Iselin, NJ 08830.